**FRIEDMAN & JAMES LLP**
**Andrew V. Buchsbaum, Esq. (AB-6475) (abuchsbaum@friedmanjames.com)**
Attorneys for Plaintiff
132 Nassau Street
New York, NY 10038
(212) 233-9385



RECEIVED
SEP 0 6 2007
U.S.D.C. S.D. N.Y.
CASHIERS

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

MICHAEL TOSCANO and DONNA TOSCANO,

                Plaintiffs,

  -against-

LINCOLN ELECTRIC COMPANY; HOBART
BROTHERS COMPANY; ILLINOIS TOOL WORKS,
INC.; THE ESAB GROUP, INC.; SELECT ARC, INC.;
BOC GROUP, INC. f/k/a AIRCO, INC.; J. B. ALLOY
CORPORATION a/k/a UNIBRAZE CORPORATION;
PRAXAIR, INC.; TDY INDUSTRIES, INC.;
TECHALLOY COMPANY, INC.; CBS
CORPORATION, a Delaware corporation, f/k/a
VIACOM, INC., successor by merger to CBS
CORPORATION, a Pennsylvania corporation, f/k/a
WESTINGHOUSE ELECTRIC CORPORATION;
UNION CARBIDE CORPORATION; EUTECTIC
CORPORATION; A.O. SMITH CORPORATION;
SANDVIK, INC.; DELORO STELLITE COMPANY,
INC.; ARCOS INDUSTRIES, L.L.C.; MILLER
ELECTRIC MANUFACTURING CO., INC.; THE
CITY OF NEW YORK; and JOHN DOE
DEFENDANTS A-Z,

                Defendants.
-------------------------------------------------------------------X

JUDGE KEENAN

**07 CIV** No: **7855**

ORIGINAL COMPLAINT
INCLUDING SEAMAN'S CASE
UNDER THE JONES ACT FOR
PERSONAL INJURIES


PLAINTIFF DEMANDS A
TRIAL BY JURY

**SUITS UNDER SPECIAL RULE FOR SEAMEN TO SUE
WITHOUT SECURITY OR PREPAYMENT OF FEES FOR THE
ENFORCEMENT OF THE LAWS OF THE UNITED STATES,
COMMON AND STATUTORY FOR THE PROTECTION OF AN
FOR THE HEALTH AND SAFETY OF SEAMEN AT SEA**

1

Michael Toscano v. Lincoln ElectricCompany, et al
Plaintiff's Original Complaint Including Seaman's Case Under the Jones Act For Personal Injuries

Plaintiff, MICHAEL TOSCANO, by his attorneys, complaining of the Defendants, alleges as follows based upon personal knowledge as to his own acts, and upon information and belief as well as his attorneys' investigation as to the acts of Defendants. Plaintiff previously entered into a tolling agreement with Welding Defendants as hereinafter identified to defer litigation of his claims. Plaintiff now files this Complaint in federal court pursuant to that agreement.

## THE PARTIES

1. Plaintiff MICHAEL TOSCANO is a citizen and resident of New York. Plaintiff MICHAEL TOSCANO has suffered and continues to suffer severe physical and emotional injuries, some or all of which may be permanent, and has incurred and will continue to incur medical expenses, as a result of exposure to toxic welding fumes.

2. Plaintiff DONNA TOSCANO is the wife of plaintiff MICHAEL TOSCANO and brings her derivative claim for loss of services and consortium as a result of the injuries sustained by plaintiff MICHAEL TOSCANO.

3. LINCOLN ELECTRIC COMPANY ("Lincoln"), Welding Defendant herein, is a corporation incorporated under the laws of Ohio, transacting business within the State of New York with a registered agent within the State of New York c/o C.T. Corporation System, 111 Eighth Avenue, New York, NY 10011. Lincoln designed, manufactured, assembled, inspected, tested, distributed and/or sold welding consumables.

4. HOBART BROTHERS COMPANY ("Hobart"), Welding Defendant herein, is a corporation incorporated under the laws of Ohio transacting business within the State of New York with a registered agent within the State of New York c/o C.T. Corporation System, 111

2

Eighth Avenue, New York, NY 10011. Hobart designed, manufactured, assembled, inspected, tested, distributed and/or sold welding consumables.

5.      ILLINOIS TOOL WORKS, INC. ("ITW"), Welding Defendant herein, is a corporation incorporated under the laws of Delaware transacting business within the State of New York with a registered agent within the State of New York c/o  C.T. Corporation System, 111 Eighth Avenue, New York, NY 10011. ITW designed, manufactured, assembled, inspected, tested, distributed and/or sold welding consumables.

6.      THE ESAB GROUP, INC. ("ESAB"), Welding Defendant herein, is a corporation incorporated under the laws of Delaware transacting business within the State of New York with a registered agent within the State of New York c/o C.T. Corporation System, 111 Eighth Avenue, New York, NY 10011. ESAB designed, manufactured, assembled, inspected, tested, distributed and/or sold welding consumables.

7.      SELECT ARC, INC., ("Select Arc"), Welding Defendant herein, is a corporation incorporated under the laws of Ohio transacting business within the State of New York, and may be served with process c/o its President Dale Stager, at its principal place of business, 600 Enterprise Drive, P.O. Box 259, Fort Loramie, OH, 45845-0259.  SELECT ARC designed, manufactured, assembled, inspected, tested, distributed and/or sold welding consumables.

8.      BOC GROUP, INC. f/k/a AIRCO, INC. ("Airco"), Welding Defendant herein, is a corporation incorporated under the laws of Delaware transacting business within the State of New York, with its registered agent c/o James P. Blake, 575 Mountain Avenue, Murray Hill, NJ 07974.  Airco designed, manufactured, assembled, inspected, tested, distributed and/or sold welding consumables.

9.    J. B. ALLOY CORPORATION. a/k/a UNIBRAZE CORPORATION ("Unibraze"), Welding Defendant herein, is a corporation incorporated under the laws of Texas transacting business within the State of New York, and may be served with process c/o its President Larry Robinson, at 1050 Penner Crest Street, Houston, TX 77055. Unibraze designed, manufactured, assembled, inspected, tested, distributed and/or sold welding consumables.

10.    PRAXAIR, INC. ("Praxair"), Welding Defendant herein, is a corporation incorporated under the laws of Delaware transacting business within the State of New York, with its registered agent in the State of New York c/o The Prentice-Hall Corporation System, Inc., 80 State Street, Albany, NY 12207. Praxair designed, manufactured, assembled, inspected, tested, distributed and/or sold welding consumables.

11.    TDY INDUSTRIES, INC. ("Teledyne"), formerly known as Teledyne Industries, Inc., Welding Defendant herein, is a corporation incorporated under the laws of California transacting business within the State of New York, with  its registered agent in the State of New York c/o  C.T. Corporation System, 111 Eighth Avenue, New York, NY 10011.  Teledyne designed, manufactured, assembled, inspected, tested, distributed and/or sold welding consumables.

12.    TECHALLOY COMPANY, INC. ("Techalloy"), Welding Defendant herein, is a corporation incorporated under the laws of Pennsylvania transacting business within the State of New York, and may be served with process c/o its  President H. Lopes, at 370 Franklin Turnpike, Mahway, PA 74300. Techalloy designed, manufactured, assembled, inspected, tested, distributed and/or sold welding consumables.

13.    CBS CORPORATION ("CBS"), Welding Defendant herein, is a Pennsylvania corporation, f/k/a Viacom Inc. ("Viacom"), successor by merger to CBS Corporation, a

4

Pennsylvania corporation, f/k/a Westinghouse Electric Corporation ("Westinghouse"), transacting business in the State of New York with its registered agent within the State of New York c/o The Corporation, C/O McMorrow-Castro, 51 West 52nd Street, New York, NY 10019. Westinghouse designed, manufactured, assembled, inspected, tested, distributed and/or sold welding consumables.

14.    UNION CARBIDE CORPORATION ("Union Carbide"), Welding Defendant herein, is a corporation incorporated under the laws of New York, with its registered agent c/o C.T. Corporation System, 111 Eighth Avenue, New York, NY 10011. Union Carbide designed, manufactured, assembled, inspected, tested, distributed and/or sold welding consumables.

15.    EUTECTIC CORPORATION ("Eutectic"), Welding Defendant herein, is a corporation organized under the laws of New York, and may be served with process c/o its Chief Executive Officer John Kirkwood, at its corporate headquarters, 40-40 172nd Street, Flushing, NY 11358. Eutectic designed, manufactured, assembled, inspected, tested, distributed and/or sold welding consumables.

16.    A. O. SMITH CORPORATION ("Smith"), Welding Defendant herein, is a corporation incorporated under the laws of Delaware transacting business within the State of New York, with its registered agent located in the State of New York c/o The Prentice-Hall Corporation System, 80 State Street, Albany, NY 12207. Smith designed, manufactured, assembled, inspected, tested, distributed and/or sold welding consumables.

17.    SANDVIK, INC. ("Sandvik"), Welding Defendant herein, is a corporation incorporated under the laws of Delaware transacting business within the State of New York, and may be served with process c/o its Vice President William Dempsey, at 982 Griffin Pond Road,

5

Michael Toscano v. Lincoln Electric Company, et al
Plaintiff's Original Complaint Including Seaman's Case Under the Jones Act For Personal Injuries

Clarks Summit, PA 18411. Sandvik designed, manufactured, assembled, inspected, tested, distributed and/or sold welding consumables.

18.    DELORO STELLITE COMPANY, INC. ("Deloro"), Welding Defendant herein, is a corporation incorporated under the laws of Delaware transacting business within the State of New York, and may be served with process c/o its Chief Execute officer Hans Nilsson, at its headquarters, 1201 Eisenhower Drive N., Goshen, IN 46526-5311. Deloro designed, manufactured, assembled, inspected, tested, distributed and/or sold welding consumables.

19.    ARCOS INDUSTRIES, L.L.C., f/k/a ARCOS ALLOYS d/b/a HOSKINS MANUFACTURING COMPANY ("ARCOS"), Welding Defendant herein is a limited liability company organized under the laws of the state of Michigan transacting business within the State of New York, and may be served with process c/o Michael Tecklenburg, at its headquarters, One Arcos Drive, Mount Carmel, PA 17851. ARCOS designed, manufactured, assembled, inspected, tested, distributed and/or sold welding consumables.

20.    THERMADYNE HOLDINGS CORPORATION ("Thermadyne"), Welding Defendant herein, is a corporation incorporated under the laws of Delaware transacting business within the State of New York, and it may be served with process at its headquarters, c/o President and CEO Randall E. Curran, at 16052 Swingley Ridge Road, Suite 300, St. Louis, MO 63017. Thermadyne designed, manufactured, assembled, inspected, tested, distributed and/or sold welding consumables.

21.    MILLER ELECTRIC MANUFACTURING CO., INC., ("Miller"), Welding Defendant herein, is a corporation duly organized under the laws of the State of Wisconsin transacting business within the State of New York, and it may be served with process at its headquarters, c/o President Mike Weller, at 1635 W. Spencer Street, P.O. Box 1079, Appleton,

WI 54912-1079. Miller designed, manufactured, assembled, inspected, tested, distributed and/or sold welding consumables and machines.

22.    THE CITY OF NEW YORK, Defendant herein, is a municipal corporation with offices within the State and City of New York and may be served with process care of the Corporation Counsel's office, 100 Church Street, New York, NY and/or the City of New York Comptroller's Office, 1 Centre Street, New York, NY.

23.    JOHN DOE DEFENDANTS A-Z, Welding Defendants herein, are of identities that are unknown to Plaintiff at this time, but when those parties' true identities are discovered, the pleadings will be amended by substituting their true names and giving proper notice under the Rules of this Court. These Welding Defendants include sellers, suppliers, distributors, and manufacturers that, at any time relevant to these proceedings, supplied welding equipment, supplies, and steel/metal products containing manganese to the site(s) at which Plaintiff was exposed to toxic fumes, and by virtue of which Plaintiff sustained the damages alleged herein. John Doe Defendants A-Z also include unknown members of AWS (the American Welding Society), NEMA (the National Electric Manufacturer's Association) and TFA (the Ferroalloys Association), whose negligence and breaches caused or contributed to cause the Plaintiff's damages and injuries.

24.    The Welding Defendants fall into one of two categories: manufacturers and co-conspirators. The co-conspirators consist of the manufacturers, individual manufacturing members of the trade associations, and non-manufacturer-members of the trade associations.

### JURISDICTION AND VENUE

25.    This Court has jurisdiction pursuant to the Jones Act, 46 U.S.C. § 30104 et seq. (formerly codified at 46 U.S.C. § 688); and/or pursuant to 28 U.S.C. §1331 (federal question);

and/or pursuant to 28 U.S.C. § 1333 (admiralty and maritime); and/or pursuant to 28 U.S.C. §1367 (supplemental jurisdiction); and/or pursuant to the doctrine of pendent party jurisdiction.

26.     Venue is proper in this District because Defendants reside in this District insofar as they manufactured, sold and/or marketed welding rods within this District, as well as in the District of residence of the Plaintiff, and throughout the United States, with the expectation that this product would be purchased and or used throughout this District and the United States. Further, venue is proper in that Defendant the City of New York is located within the jurisdiction of this Court.

## FACTS

27.     At all times relevant hereto, Plaintiff was exposed to toxic fumes resulting from welding operations.

28.     The ordinary and intended use of welding products causes emission of fumes that contain, among other substances, manganese ("welding fumes").

29.     Since 1837, manganese has been medically and scientifically recognized as toxic to the human central nervous system in levels that exceed the trace amounts normally found in the human body. Toxicity of manganese causes progressive, disabling neurological damage known alternatively as Parkinsonism secondary to manganese exposure, manganese induced Parkinsonism, manganese poisoning, manganism or neuropsychological injury. People who suffer from manganese poisoning suffer from debilitating neurological problems that amongst other things affect their ability to think, talk, eat, move, sleep, and work.

30.     Persons exposed to welding fumes absorb them into their body primarily through inhalation. Cases involving manganese exposure for a period as short as 49 days

8

causing manganese poisoning and progressive, disabling, neurological damage have been documented.

31.    Plaintiff was exposed to welding fumes while using welding products and equipment or working in the proximity of other persons using welding products or equipment.

32.    As a direct and proximate result of exposure to welding fumes, the Plaintiff developed a neurological injury. To date the Plaintiff has suffered, continues to suffer, and will continue to suffer permanent neurological and physical damage, severe physical and mental pain, loss of wages, loss of earning capacity, disability, medical expenses, and loss of enjoyment of life.

33.    At all relevant times, the Plaintiff was unaware of the dangerous nature of welding fumes, manganese, and the neurological injuries that could occur because of exposure to welding fumes.

34.    Any reasonable persons, including the Plaintiff, if adequately informed of the hazards of exposure to welding fumes, would not have willingly exposed him or herself to welding fumes in workplaces without necessary precautionary measures.

35.    Through industry and medical studies, unknown to the Plaintiff, Defendants knew or should have known of the health hazards inherent in the products they were selling, distributing, or using. Defendants ignored or deliberately and fraudulently concealed that information, or condoned the concealment, and/or conspired with, devised, encouraged, or aided others and/or each other to do so, to advance their conspiracy to continue to sell their harmful products without the consequences of selling a product known to cause these injuries and/or avoid the costs of safety precautions, and/or avoid litigation by people injured by welding fumes. Defendants' actions and omissions constitute gross negligence and demonstrate a

9

reckless disregard for the rights and safety of others, justifying punitive damages against the Defendants.

36.    Defendants committed numerous tortious acts that included fraudulently and negligently misrepresenting, concealing, suppressing, and omitting material information about the health effects of welding fumes and precautionary measures as specifically alleged below.

37.    Most Welding Defendants are or were manufacturers of welding products (consumables and machines) and were members, or participants though their executive employees or designated representatives, in the National Electric Manufacturer's Association ("NEMA"), The Ferroalloys Association ("TFA") and/or the American Welding Society ("AWS"), (collectively "trade organizations") during all relevant times.

38.    NEMA is a trade organization comprised of manufacturers that has a section devoted to the manufacturers of welding products known as "NEMA Electric Welding Section" or "NEMA Arc Welding Section" ("NEMA Welding Section").

39.    TFA is an industry advocacy group consisting of producers of chromium, manganese, silicon, and vanadium ferroalloys that sponsored a manganese subcommittee that includes representatives from welding manufacturers and the AWS and NEMA. The TFA's membership included management representatives of companies that produce welding products and large consumers that purchase the products for use in their operations.

40.    AWS is a trade organization that includes within its membership management representatives of companies that manufacture and sell welding products, and large consumers that buy the products for use in their operations.

41.    Defendants created committees within these trade organizations and then used the committees to fraudulently and negligently misrepresent, conceal, suppress, and omit material information about the health effects of welding fumes and necessary precautionary measures.

42.    Specific examples of the trade association committees controlled by Defendants and their activities are identified below.    Defendants controlled and used the committees to conceal the dangers from people exposed to welding fumes by:

a.    limiting individual membership on relevant committees exclusively or primarily to employees of the Defendants or their designated representatives;

b.    maintaining, through Defendants' delegates, majority or exclusive voting control of the committees at all times;

c.    selecting the assignments or proposals considered by each committee;

d.    funding projects chosen by Defendants;

e.    using Defendants' delegates to prepare the written records of the business transacted by each committee; and

f.    reviewing and editing, to the satisfaction of Defendants, studies performed by consultants hired by the committees.

43.    From at least 1937 to the present, Defendants, by their actions and through trade association committees they controlled, undertook studies, issued product labels and other health and safety information, and issued specifications and standards for ventilation, safety equipment, and other precautionary measures.

44.    At all times, Defendants acted with the intent to conceal the health hazards of welding fumes, and specifically manganese, knowing that their studies, publications, specifications, and standards would be adopted and relied upon by manufacturers, sellers, and consumers of welding products, as the authoritative source for warnings, instructions, and

11

precautionary measures printed on product labels and otherwise distributed in the stream of commerce.

45.    Defendants had actual knowledge about the causal relationship between manganese-containing welding fumes and neurological injury. Defendants concealed this information from workers' exposed to welding fumes.

46.    The causal connection between neurological injuries and welding fumes containing manganese was scientifically documented no later than 1932. In 1932, a medical article authored by Dr. Erich Beintker was published documenting two cases of welders with neurological injury caused by manganese poisoning from welding fumes. The copy of this article or a summary of the medical article was received in the libraries of many or all Defendants at or near the time of publication.

47.    In 1937, NEMA's Welding Section received further notice of the contents of the 1932 medical article through a welding safety booklet published by an insurance company stating that manganese in welding fumes "causes a disease similar to *paralysis agitans* [Parkinson's disease]."

48.    In 1944, NEMA's Welding Section received notice of a claim of manganese poisoning in a welder.

49.    In 1958, the AWS sponsored Z49 Committee issued a technical document, (not intended for use by welders) approved by the AWS Technical Committee, an oversight committee for AWS activities, reflecting its knowledge that manganese in welding fumes is a potentially toxic substance.

50.     In 1966, at a meeting of a task group of the AWS Filler Metal Committee, members of the committee reviewed an industrial hygiene article identifying manganese as a toxic substance in welding fumes, and the Committee discussed neurological injuries in welders.

51.     In 1970, the AWS Task Group on Welding Fumes received notice, through a literature search submitted by a consultant hired by the Task Group on Welding Fumes, that welding fumes could cause neurological damage due to manganese poisoning, and that the symptoms of manganese poisoning resemble the symptoms of Parkinson's disease.

52.     In 1970, the AWS Task Group on Welding Fumes received notice, through a welding fume study conducted by a consultant hired by the Task Group on Welding Fumes, that welding fumes could easily exceed the recommended occupational exposure guidelines, even when ventilation standards specified by Defendants were followed.

53.     Beginning at least in the late 1970s, the AWS Safety and Health Committee received notice of claims of welders suffering neurological injuries from manganese in welding fumes.

54.     In 1978, the AWS Safety and Health Committee received notice, through a literature search report submitted by a consultant hired by the Committee, that welders can suffer neurological damage from manganese in welding fumes. A portion of this report is quoted below:

> "Although a number of cases...have been reported, there are no recent studies reported in the literature which explore the magnitude of the problem of chronic manganese poisoning in welders. In future epidemiological studies of various welding populations, the prevalence of this disease should be investigated.
>
> Early symptoms of chronic manganism include restlessness, irritability and a tendency to laugh or cry without purpose. These symptoms may be followed by apathy, visual hallucinations,

13

uncontrollable impulse, flight of ideas, mental confusion or euphoria.

Mask-like facial expression, spastic grin, muscle rigidity, slow gait with sliding of the feet, increased and abnormal reflexes, monotonous blurred speech with poor articulation, tremors, irregular handwriting, impaired hearing, double vision, abnormal reactions to pain, touch, heat and pressure, excessive salivation and perspiration, sexual impotence and diminution of libido have been described by various authors.... Mental activity is reported to be slowed, judgment impaired and memory weakened, but intelligence remains normal.

The observation that manganism resembles Parkinson's disease deserves emphasis. Although no data on the prevalence of Parkinsonism in welders are available, there is a concern that some cases of manganese poisoning could be mistakenly diagnosed as Parkinson's disease. Further investigations may be warranted.

Manganism, like Parkinsonism, responds favorably to treatment with the drug levodopa (L-dopa), indicating that the two diseases may share certain biological abnormalities: depletion of dopamine (a neurotransmitter in the basal ganglia of the brain) and depletion of melanin pigment content of the nerve cells of the substantia nigra, also in the brain."

55.     I n 1978, the same consultant described above in paragraph 60 reported to the AWS Safety and Health Committee that manganese poisoning from welding fumes could be misdiagnosed as idiopathic Parkinson's disease, and that the problem was so widespread that it recommended that an epidemiologic study be conducted.

56.     In 1979, the AWS Research Committee and the AWS Executive Committee on Safety and Health concluded that there was sufficient evidence to justify the funding of an epidemiologic study that would include the study of neurological problems in welders. The committee voted to undertake this epidemiologic study, although it was never completed.

57.     In 1983, the AWS Safety and Health Committee received notice through an independent literature search that manganese poisoning is "readily confused with Parkinson's

14

disease," and also that in a study in India, 40% of the welders studied suffered "neurological injury."

58.     Beginning in the late 1970s and early 1980s, Defendants through the AWS Safety and Health Committee and NEMA Welding Section sponsored "Industry Defense Committee," received notice of claims of manganese poisoning filed as lawsuits against companies in the welding industry.

59.     In 1984, the chairperson of the AWS Safety and Health Committee admitted "manganese fumes can cause a disease quite similar to Parkinson's disease after six months to two years of exposure." Defendants knew or should have known of this admission.

60.     Beginning in 1985 and continuing to the present, certain Defendants admitted in their Manufacturer Safety Data Sheets ("MSDS"), which are technical documents not intended for reading by welders, their knowledge that manganese in welding fumes could cause neurological damage.

61.     Because not all Defendants attended each trade organization meeting, it was a regular practice of the trade organization committees to publish written minutes that were disseminated to all committee members, including those not in attendance, for the purpose of ratifying and adopting the actions taken and decisions made at the meetings.

62.     At a meeting of NEMA's Welding Section held on March 16, 1937, Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal known hazards associated with welding fumes by forming a "Dust and Smoke Committee" to preempt investigation of welding fume hazards by independent sources that were not controlled by Defendants.

63.    During meetings of NEMA's Welding Section held between January 20 and June 23, 1938, Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal known hazards of welding fumes by changing the language of a publication issued by an insurance company to delete the original statement in the publication that manganese in welding fumes causes a disabling illness similar to Parkinson's disease.

64.    In 1939-40, at meetings of NEMA's Welding Section, Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal the hazards of welding fumes by purporting to undertake an investigation of the health hazards of welding fumes and then, upon its completion, changing the conclusions of the study, so as to falsely represent that welding fumes were not harmful to welders.

65.    In 1949, as part of a scheme to create and disseminate false evidence useful in defending against claims brought by persons injured by exposure to welding fumes, Defendant members of NEMA's Arc Welding Section agreed to and did intentionally, knowingly, and recklessly conceal known hazards of welding fumes by providing information for and causing publication in a welding trade journal of a two-part article that made the misrepresentation that welding fumes were not toxic.

66.    In 1949 and 1951, at meetings of NEMA's Arc Welding Section which considered precautionary measures, Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by rejecting the adoption of any precautionary product labels for welding products because Defendants feared that welders would be afraid to use welding products if they saw precautionary product labels, and therefore sales of welding products would be reduced.

16

67.     In 1952, Defendants reorganized the AWS Safety Recommendations Committee and called a meeting to consider the furnishing of safety and health information at which they agreed to, and did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by rejecting the adoption of any precautionary product labels for welding products.

68.     In 1952, at another meeting of the AWS Safety Recommendations Committee, Defendants in attendance agreed to, and did intentionally, knowingly, and recklessly adopt a policy of refuting existing reports of welding fume hazards by publishing their own reports that misrepresented exposure to welding fumes as safe.

69.     In 1957, Defendants agreed to, and did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by sponsoring the publication of an article in the *Welding Engineer* trade publication that made the misrepresentation that "toxic gases are not produced by electrode coatings."

70.     In 1966, at meetings of the AWS A5 Filler Metal Committee and a task group, Defendants in attendance intentionally, knowingly, and recklessly agreed to publication in a trade journal or an article misrepresenting the health hazards of welding fumes as causing only "temporary disability."

71.     In 1966, at other meetings of the A5 Filler Metal Committee of the AWS and a task group of that committee, the Defendants in attendance agreed to, and did intentionally, knowingly, and recklessly conceal health hazards of welding fumes by establishing industry-wide specifications for precautionary product labels that failed to warn workers of the danger of manganese in welding fumes. This precautionary label stated:

> Welding may produce fumes and gases hazardous to health. Avoid breathing these fumes and gases. Use adequate ventilation. See USAS Z49.1 "Safety in Welding & Cutting," published by the American Welding Society.

17

At these meetings of the A5 Filler Metal Committee of the AWS and a Task Group of that committee, Defendants in attendance established industry-wide specifications for precautionary product labels which did intentionally, knowingly, and recklessly omit instructions about necessary ventilation, precautionary measures, and other information, needed to protect workers against the toxic effect of manganese.

72.    In 1966-67, through votes on ballots distributed to Defendants through the A5 Filler Metal Committee of the AWS, Defendants did intentionally, knowingly, and recklessly approve, as part of the AWS required specifications for most welding products, a precautionary product label concealing health hazards from welding fumes and omitting instructions about necessary ventilation, precautionary measures, and other information.

73.    From 1975-79 Defendants, through the AWS Committee on Safety and Health, did intentionally, knowingly, and recklessly conceal the known hazards of welding fumes by providing information that misrepresented the hazards associated with welding fumes as part of a deliberate scheme to prevent an independent standard-setting organization from lowering the occupational exposure guidelines for iron oxide and general welding fumes.

74.    In 1979, at meetings of a joint AWS-NEMA committee consisting of a special Task Group of the A5 Filler Metal Committee of the AWS and the Labeling and Safe Practices Committee of NEMA's Arc Welding Section, Defendants intentionally, knowingly, and recklessly established industry-wide specifications for precautionary product labels that concealed the health hazards of welding fumes by omitting any reference to the toxic effects of manganese in welding fumes. At these meetings, Defendants also intentionally, knowingly, and recklessly established inadequate industry specifications for precautionary measures, and other information needed to protect workers against the toxic effects of manganese in welding fumes.

18

75.     In 1979, through votes on a ballot distributed to Defendants through the AWS-

NEMA Joint Committee On Precautionary Labels and the A5 Filler Metal Committee of the

AWS, Defendants did intentionally, knowingly, and recklessly approve as part of the required

industry-wide specifications for most welding products a precautionary product label concealing

health hazards and omitting instructions about necessary ventilation, precautionary measures,

and other information.  This precautionary label stated in pertinent part:

> "WARNING: Protect yourself and others.  Read and understand
> this label.
>  FUMES AND GASES can be dangerous to your health.
> Read and understand the manufacturer's instructions and your
> employer's safety practices.
> Keep your head out of the fumes.
> Use enough ventilation, exhaust at the arc, or both, to keep the
> fumes and gases from your breathing zone, and the general area.
> See American National Standard Z49.1 "Safety in Welding and
> Cutting" published by the American Welding Society."

76.     Beginning in 1979 and continuing until the present time, at meetings of the AWS

Technical Council and Board of Directors, Defendants in attendance did intentionally,

knowingly, and recklessly conceal the health hazards of welding fumes by failing and refusing to

perform an epidemiological study, recommended by other AWS committees and an independent

consultant retained by the Defendants, to investigate the neurological effects of welding fumes

on persons exposed to welding fumes.

77.     In 1980, at meetings of NEMA's Ad Hoc Committee on Precautionary Labeling,

Defendants in attendance did intentionally, knowingly, and recklessly conceal health hazards of

welding fumes by approving industry specifications for precautionary product labels for welding

power sources that omitted reference to the toxic effects of manganese in welding fumes on

persons exposed to welding fumes.

19

78.    Beginning in 1980, at meetings of the NEMA Ad Hoc Committee on Precautionary Labeling, Defendants in attendance did intentionally, knowingly, and recklessly approve industry specifications for precautionary product labels for welding power sources that omitted necessary instructions about ventilation, precautionary measures, and other information needed to protect against the toxic effects of manganese in welding fumes.

79.    Beginning in 1980 and continuing until 1996, at meetings of the NEMA MSDS Task Force Committee and the AWS SH-4 Ad Hoc Committee on Suggestions and Changes to NEMA Publication EW 5-1982, Defendants in attendance did intentionally, knowingly, and recklessly agree to conceal health hazards of welding fumes by adopting a recommended format for the Hazardous Material and Health Hazard Data sections of the Material Safety Data Sheets (MSDS) for welding products that omitted reference to the manganese content of welding fumes, the neurological damage caused by manganese in welding fumes, and necessary instructions for protection against the health hazards of welding fumes.

80.    Beginning in 1993 and continuing to the present time, Defendants, through the AWS Safety and Health Committee and NEMA Welding Section, did intentionally, knowingly, and recklessly seek to conceal the health hazards of manganese in welding fumes by appointing designated representatives to become committee members of, and providing funding for, the TFA to oppose restrictions on the guidelines for manganese exposure levels established by various authorities.

81.    In 1993-95, Defendants, through the above described organization sponsored by the AWS Safety and Health Committee and NEMA Welding Section, as part of a scheme to prevent the lowering of occupational exposure guidelines for manganese in welding fumes established by the American Conference of Governmental Industrial Hygienists ("ACGIH"), did

20

intentionally, knowingly, and recklessly seek to conceal the health hazards of manganese in welding fumes by providing false and misleading information that exposure to manganese in welding fumes did not cause neurological injury.

### FIRST CLAIM -- CONSPIRACY AND FRAUDULENT CONCEALMENT

82.    Plaintiff re-alleges and incorporates the foregoing allegations.

83.    At all relevant times Defendants with knowledge of the health hazards of manganese in welding fumes, acted in concert and conspired in pursuance of a common plan or design to commit the tortious acts against Plaintiff.

84.    Defendants combined with each other, and with non-defendants, to engage in unlawful conduct. In furtherance of the conspiracy, Defendants committed the following overt and tortious acts:

   a.    fraudulently concealing, misrepresenting, and suppressing material scientific and medical information about the toxic effects of manganese in welding fumes;

   b.    deliberately failing to adequately warn persons in proximity of welding fumes of the known health hazards of manganese in welding fumes;

   c.    deliberately breaching their duty to instruct about proper ventilation, safety equipment, or other precautionary measures which would protect against the health hazards of manganese in the welding process;

   d.    deliberately breaching their duty to investigate the health hazards of manganese welding;

   e.    selling welding products in a defective condition and/or without necessary warnings of the catastrophic health hazards or instructions concerning precautionary measures; and

   f.    avoiding the results of the scrutiny of governmental and safety organizations that would have occurred had Defendants not concealed the true nature and extent of the dangers of their manganese containing welding consumables.

85.    Defendants knowingly agreed to participate in the conspiracy by one or more of the following means:

21

a.    actively taking part;

b.    furthering it by cooperation; and/or

c.    ratifying and adopting acts of other conspirators done for their benefit.

86.    Defendants participated in furthering the unlawful purposes of the conspiracy by delegating responsibilities to and carrying these tasks out through the trade organization committees.

87.    Upon information and belief, Defendants committed numerous other overt and tortious acts that are unknown to Plaintiff at this time, in furtherance of the conspiracy through letters, memoranda, publications, meetings, telephone conversations, and other forms of communication directly between Defendants and through the trade organization committees.

88.    Plaintiff relied on Defendants' misrepresentation and fraud; but for Defendants' misrepresentation and fraud, Plaintiff would not have been exposed to manganese in welding fumes. As a direct and proximate result of Defendants' conspiratorial acts, Plaintiff was exposed to welding fumes at toxic levels resulting in neurological injuries and damages.

89.    Because Defendants have engaged in the conspiracy outlined above, all Defendants are jointly and severally liable for Plaintiff's damages.

### SECOND CLAIM -- COMMON LAW FRAUD -- FAILURE TO DISCLOSE

90.    Plaintiff re-alleges and incorporates the foregoing allegations.

91.    Defendants committed common law fraud against the Plaintiff.

92.    Defendants failed to disclose and concealed material facts within their knowledge.

93.    Defendants knew that Plaintiff was ignorant of the fact and did not have an equal opportunity to discover the truth about the dangers presented by Defendants' products.

22

94.    These Defendants intended to induce Plaintiff to take some action, among other things, to buy and use their products, by failing to disclose the fact.

95.    Plaintiff relied on Defendants' fraud; but for Defendants' fraud, he would not have been exposed to toxic levels of manganese in welding fumes.

96.    Plaintiff suffered injury as a result of acting without knowledge of the undisclosed facts.

## THIRD CLAIM -- NEGLIGENCE

97.    Plaintiff re-alleges and incorporates the foregoing allegations.

98.    At all relevant times, it was reasonably foreseeable by Defendants that welders and persons in proximity to welders, including Plaintiff, would be exposed to welding fumes containing manganese by using welding products or working in proximity of other workers using welding products.

99.    Defendants have the duty imposed by law, or have assumed the duty, to exercise reasonable care for the safety of Plaintiff and similarly situated persons.

100.    Because exposure to welding fumes presents a risk of physical harm, all Defendants had a legal duty to exercise reasonable care for the safety of Plaintiff when making representations about welding safety and health in warning labels, publications, instructions for ventilation and other precautionary measures.

101.    Defendants knew, or in the exercise of ordinary care should have known, that persons exposed to welding fumes would act in reliance upon representations made by Defendants about the health hazards associated with welding fumes and the precautionary measures required to protect against those health hazards.

102.    Defendants knew, or in the exercise of ordinary care should have known, that welding fumes would cause neurological damage to workers like Plaintiff.

103.    Defendants breached their duty of reasonable care and were negligent, without regard to whether the acts were intentional, knowing, or reckless.

104.    Beginning in 1970, Defendants violated OSHA standards about publication of information about health hazards through MSDS guidelines that omitted necessary instructions about target organs, ventilation, precautionary measures, and other information needed to protect against the toxic effects of manganese in welding fumes.

105.    Defendants violated industry standards about health and safety as set forth in the Z49 documents adopted by the AWS sponsored Z49.1 committee beginning in 1950 by failing to publish adequate warning of precautionary instructions and other information to welders or persons in the proximity to welding fumes about the standard.

106.    Defendants' negligent acts and omissions were the direct and proximate causes of the occurrence in question and Plaintiff's injuries and damages.

## FOURTH CLAIM -- NEGLIGENCE-SALE OF PRODUCT

107.    The Plaintiff re-alleges and incorporates the foregoing allegations.

108.    Certain Defendants, during some or all relevant times, manufactured sold, and/or distributed welding products that were supplied to Plaintiff and/or Plaintiff's coworkers for use.

109.    Plaintiff was exposed to welding fumes containing manganese from products sold by these Defendants, while using the products or working in the proximity of others using the products.

110.    These Defendants had the duty, as product sellers, to exercise reasonable care for the safety of the foreseeable users of the product and those around them, including Plaintiff.

24

111    These duties included the responsibility for the following safety and health matters relating to welding fumes:

    a.    the investigation of the health hazards;

    b.    writing and publishing adequate and timely precautionary product labels and other health and safety information; and

    c.    writing and publishing adequate and timely specifications and standards about ventilation, safety equipment, and other precautionary measures.

112.    These Defendants knew, or in the exercise of reasonable care should have known, that welding fumes would cause neurological damage to welders and/or those around them like Plaintiff.

113.    These Defendants breached their duty of reasonable care to Plaintiff and were negligent, without regard to whether the acts were intentional, knowing, malicious or reckless.

114.    These Defendants violated industry standards about health and safety as set forth in the Z49 documents adopted by the AWS sponsored Z49.1 committee beginning in 1950 by failing to publish adequate and timely warning of precautionary instructions and other information to welders or persons in the proximity to welding fume about the standard.

115.    These Defendants' negligent acts and omissions were the direct and proximate causes of the occurrence in question and Plaintiff's injuries and damages.

### FIFTH CLAIM -- LIABILITY TO PLAINTIFF FOR NEGLIGENT PERFORMANCE OF UNDERTAKING

116.    Plaintiff re-alleges and incorporates the foregoing allegations.

117.    Defendants, individually, collectively, and as members and participants in AWS and NEMA, held themselves out to Plaintiff, his employers, OSHA and other governmental agencies, ACGIH, the welding industry, and the public health community as the leaders in all issues relating to the health and safety of welders and welding fumes.

25

118.    Defendants, individually, collectively, and as members and participants in AWS's

"Safety and Health Committee" and NEMA, undertook the

following duties:

"The AWS Task Group on Welding Fumes recommends that the
AWS reconfirm as a Society policy active leadership in all
(emphasis in the original) aspects of the health and safety problems
in welding and allied fields, aggressively pursuing the solutions to
these problems with other professional organizations, industry,
government and labor."

"It is the duty of this committee to promote knowledge concerning
occupational and environmental effects on the health and safety of
personnel involved in welding and allied processes, including the
storage and handling of welding equipment and materials."

"It is the duty of this committee to develop safe practices and
standards for such processes, to ensure a safe working environment
for welders and associated personnel."

119.    According to Caterpillar's corporate representative, it joined AWS's

"Safety and Health Committee" in order to: "be involved with the organization of other people

on the committee to review and offer suggestions on welding safety and health."

120.    Defendants, individually, collectively, and as members and participants in AWS

and NEMA, voluntarily undertook the duty to inform and apprise Plaintiff, his employers, OSHA

and other governmental agencies, ACGIH, the welding industry, and the public health

community of all issues relating to the health and safety of welders and welding fumes, including

the risk of neurological injury from manganese in welding fumes and how to avoid such injury.

This was done through their role in developing the warnings and MSDS on the welding

consumables used by the Plaintiff as well as their role in the publication of welder health and

safety publications and medical/scientific articles, including Met Life's "Health Protection of

Welders" and "Health Protection in Welding" and AWS's "Batelle Report," "Franklin Research

26

Report," and "Effects of Welding on Health" publications.

121.    Defendants negligently performed the duties they undertook to provide to Plaintiff, his employers, OSHA and other governmental agencies, ACGIH, the welding industry, and the public health community under Restatement (Second) of Torts § 324A in the following ways.

122.    In undertaking the duties alleged above, Defendants, individually, collectively, and through their membership and participation in AWS and NEMA, failed to exercise reasonable care in informing Plaintiff, his employers, OSHA and other governmental agencies, ACGIH, the welding industry, and the public health community of the Plaintiff's risk of suffering neurological injury from his exposure to manganese in welding fumes of how to avoid such injury.

123.    Defendants, as the self proclaimed leaders and trustees of welding health and safety issues, knew or should have known that Plaintiff, his employers, OSHA and other governmental agencies, ACGIH, the welding industry and the public health community would rely on Defendants' undertakings concerning welder safety, Plaintiff's risk of neurological injury from exposure to manganese in welding fumes, and how to avoid such dangers in developing safety rules and regulations; product testing; welder safety programs; welding fume and manganese exposure limits; and other precautions concerning welder safety.

124.    Plaintiff, his employers, OSHA and other governmental agencies, ACGIH, the welding industry, and the public health community did in fact rely on Defendants' undertakings on issues relating to welder safety and health, Plaintiff's risk of neurological injury from exposure to manganese in welding fumes, and how to avoid such dangers in developing safety rules and regulations; welder safety programs; welding fume and manganese exposure limits;

27

and other precautions concerning welder safety.

125.    Defendants' failure to exercise reasonable care in informing Plaintiff, his employers, OSHA and other governmental agencies, ACGIH, the welding industry, and the public health community of Plaintiff's risk of developing neurological injury from exposure to manganese in welding fumes or how to avoid such injury proximately caused his neurological injury. Had Defendants accurately and truthfully informed Plaintiff, his employers, OSHA and other governmental agencies, ACGIH, the welding industry and the public health community of the actual dangers of exposure to manganese in welding fumes and how to avoid such dangers, they would have taken sufficient precautions and other measures that would have protected Plaintiff from his neurological injury. Defendants are therefore liable to the Plaintiff for their negligent undertaking.

## SIXTH CLAIM -- STRICT LIABILITY -- UNREASONABLY DANGEROUS PRODUCT -- MARKETING DEFECT -- MISREPRESENTATION

126.    Plaintiff re-alleges and incorporates the foregoing allegations.

127.    Certain defendants are manufacturers, sellers or distributors of welding machines and consumables that produce manganese-containing welding fumes. These products were expected to and did reach various industrial and commercial locations, where Plaintiff's exposure occurred, without substantial change in the condition of the product from that in which it was sold.

128.    Plaintiff was exposed to welding fumes containing manganese from products sold by the seller Defendants, while using the products or working in the proximity of others using the products.

28

129.    These Defendants' products are unreasonably dangerous because, when used for their reasonably foreseeable and intended purposes in the welding process, they produce harmful fumes that cause neurological injuries.

130.    These Defendants' products are defective because:

a.    adequate and timely warnings were not provided to users that the products produce harmful fumes;

b.    adequate and timely instructions were not provided to users about ventilation, safety equipment, or other precautionary measures;

c.    Defendants failed to test or investigate the health hazards associated with the products; and

d.    Defendants represented to the public that welding was generally safe when it was not, Plaintiff relied on the representation and was damaged, and Plaintiff invokes Restatement (Second) of Torts §402B for all purposes.

131.    The defects in Defendants' products existed when the products left Defendants' control.

132.    The defects in Defendants' products were the producing and proximate causes of the occurrences in question and Plaintiff's injuries and damages.

133.    At all relevant times, Plaintiff had no knowledge of the defects in the Defendants' products.

### SEVENTH CLAIM -- STRICT LIABILITY -- DESIGN DEFECT

134.    Plaintiff re-alleges and incorporates the foregoing allegations.

135.    Certain defendants are manufacturers, sellers or distributors of welding machines and consumables that produce manganese-containing welding fumes. These products were expected to and did reach various industrial and commercial locations, where Plaintiff's exposure occurred, without substantial change in the condition of the product from that in which it was sold.

29

136.    These Defendants are strictly liable for the defective design of both the welding machines and welding consumables. At the time these welding machines and consumables were designed, manufactured and sold by said defendants, safer alternative designs existed, which included designs other than those actually used, that had they been selected by said defendants, would have prevented or significantly reduced the likelihood of Plaintiff's injuries, and such designs were both economically and technologically feasible at the time these products left the possession of said Defendants, and had they been used, would have not have impaired the utility of the product.

137.    Specifically, Plaintiff alleges that safer alternative designs of welding consumables include those that significantly reduce welding fume in addition to allowing for source capture ventilation in all situations.

138.    Further, Plaintiff alleges that safer alternative designs of welding machines include integrated fume extraction guns, which would have captured the welding fumes at the arc, prior to entering the welder's breathing zone, and would therefore, have prevented or significantly reduced the likelihood of Plaintiff's injuries.

139.    The defects in Defendants' products existed when the products left Defendants' control.

140.    The defects in Defendants' products were the producing and proximate causes of the occurrences in question and Plaintiff's injuries and damages.

### EIGHTH CLAIM -- WARRANTY

141.    The Plaintiff re-alleges and incorporates the foregoing allegations.

142.    At all relevant times, Defendants expressly warranted in words and substance that welding products were generally safe which proved to be false. That wrongful and misleading

Michael Toscano v. Lincoln ElectricCompany, et al
Plaintiff's Original Complaint Including Seaman's Case Under the Jones Act For Personal Injuries

conduct was a producing and/or proximate cause of the occurrence and Plaintiff's injuries and damages.

143.    Plaintiff relied upon Defendants' warranties to his detriment.

## NINTH CLAIM – AIDING AND ABETTING, ACTING IN CONCERT, AND JOINT AND CONCURRENT TORTFEASER IN THE TORTIOUS FAILURE TO WARN PLAINTIFF

144.    Plaintiff re-alleges and incorporates the foregoing allegations.

145.    All of these Defendants, both individually and collectively, aided and abetted the Defendants who manufactured the welding consumables and welding machines used by the Plaintiff (hereinafter referred to as "Warning Defendants") tortious failure to warn the Plaintiff and his employers of the health hazards of exposure to manganese in welding fumes under Restatement (Second) of Torts §876(b) as alleged herein.

146.    Moreover, these Defendants also acted in concert with the Warning Defendants in their tortious failure to warn Plaintiff and his employers of the adverse health effects of exposure to manganese in welding fumes pursuant to their common plan or design to fail to warn Plaintiff and other welders that manganese in welding fumes could cause neurological injury under Restatement (Second) of Torts § 876(a) as alleged herein.

147.    Lastly, Defendants were joint and concurrent tortfeasers in the Warning Defendants' tortious failure to warn Plaintiff and his employers of the adverse health effects of exposure to manganese in welding fumes as alleged herein.

148.    Defendants, through their knowledge, review, and survey of the scientific literature, starting with the Couper and Beintker articles, the Met Life publications, and up through the present day, knew that exposure to manganese in welding fumes could cause severe neurological injury, including but not limited to manganism, parkinsonism, and Parkinson's

31

Disease.

149.    Defendants, through their membership and participation in AWS and/or NEMA and their sponsorship and funding of AWS and/or NEMA scientific literature surveys such as the AWS' "Batelle," "Franklin Research Report," and "Effects of Welding on Health" publications, knew that exposure to manganese in welding fumes causes severe neurological injury, including, but not limited to, manganism, parkinsonism, and Parkinson's Disease.

150.    Defendants, through their membership and participation in AWS and/or NEMA as well as through their own independent knowledge, knew that other welders, including A.C. Nobles, Lonnie Wisenhunt, and certain Miami welders, had developed neurological injury for exposure to welding fumes, and had filed lawsuits based on such injuries.

151.    Defendants, through their own testing and studies, consultants and experts, membership and participation in AWS and/or NEMA, and/or knowledge of the scientific literature, knew that there is no known "safe level" of exposure to Manganese in welding fumes, that compliance with the OSHA PEL and ACGIH TLV for manganese is not sufficient to protect welders exposed to manganese in welding fumes, and that welders were developing neurological injury with exposures under PEL limits.

152.    In addition and in conjunction with this knowledge set forth above, Defendants also knew that Warning Defendants were failing to adequately warn the Plaintiff or his employers of the health hazards associated with exposure to manganese in welding fumes. Rather, Defendants knew that the Warning Defendants and the rest of the welding industry had been historically underwarning, downplaying, understating, and/or under-emphasizing the hazards of exposure to manganese in welding fumes since the 1930's.

153.    For example, Defendants knew that Warning Defendants' warnings to Plaintiff

32

were inadequate because they did not adequately inform the Plaintiff that manganese was in both the welding consumable and in the welding fume; or of the amount of manganese in the welding fume; or that flux core wire emits more fume than regular stick electrodes; or that exposure to manganese in welding fume could cause neurological injury and/or brain damage; or that there is no known safe level of exposure to manganese in welding fumes; or that compliance with the PEL and TLV exposure limits does not ensure safety; or that exposure to manganese in welding fumes has been documented to cause neurological injury to welders in as little as two (2) months of exposure; or that an air supplied respirator or fume source extraction equipment was necessary to adequately protect Plaintiff from exposure to manganese in welding fumes. ¯

154.    Defendants also knew that the statements in the warning that Warning Defendants provided to the Plaintiff to use "adequate ventilation" and that "fumes and gases can be dangerous to your health" were vague, incomplete, confusing, and did not constitute a sufficient warning of the hazards of manganese in welding fume.

155.    Defendants further knew that welders did not understand or have access to Z49.1 or other "safety and health" information.

156.    Defendants also knew of the judgments and settlements of lawsuits filed by A.C. Nobles, Lonnie Wisenhunt, and the Miami welders, all of which alleged inadequate warnings concerning welding fumes. In particular, Defendants knew that the Judge in the A.C. Nobles case made a judicial finding that the warning provided to that plaintiff was inadequate.

157.    Moreover, Defendants, knew that the Warning Defendants failed to adequately investigate and/or test the health hazards of manganese in welding fumes emitted from Warning Defendants' products.

158.    However despite their knowledge of the health hazards associated with exposure

33

to manganese in welding fumes and that the Warning Defendants were failing to warn Plaintiff of such dangers, Defendants substantially assisted and encouraged the Warning Defendants' failure to warn and further, acted in concert and as joint and concurrent tortfeasers with the Warning Defendants in their tortious breach of duties to warn Plaintiff in the following ways.

159.    From approximately 1937 until approximately 1966, Defendants, and in particular Defendants Westinghouse[1], Miller Electric, ARCOS, TDY, BOC/Airco, ESAB, Eutectic, A.O. Smith, Lincoln Electric, and Union Carbide, individually, collectively, and through their participation and involvement in NEMA's Electric and Arc Welding Committees and the AWS, made, approved, supported, ratified and endorsed the decision not to warn welders about the adverse health effects of exposure to manganese in welding fumes, although they knew exposure to such fumes could be dangerous. Defendants, both individually, collectively, and through their participation and involvement in NEMA and the AWS, also encouraged and mandated that the Warning Defendants and all other welding consumable manufacturers present a united front on safety and warning issues and not to warn of the adverse health effects associated with exposure to manganese in welding fumes. Defendants, through such conduct and actions, substantially assisted and encouraged the Warning Defendants not to adequately warn the Plaintiff of the adverse health effects associated with exposure to manganese in welding fumes. Through such conduct, Defendants also acted in concert with the Warning Defendants in their common design to fail to warn Plaintiff and other welders, and further, as joint and concurrent tortfeasers with Warning Defendants in their failure to warn.

160.    Starting with the AWS' June 8, 1966 "Filler Metal" Committee Meeting, Defendants, and in particular Defendants Westinghouse, Miller Electric, ARCOS,    TDY,

---

[1] As indicated in paragraph #12 above, Westinghouse is a predecessor to Defendant CBS herein.

BOC/Airco, Eutectic, ESAB, A.O. Smith, Lincoln Electric, Union Carbide, Stoody and Hobart, individually, collectively, and through their participation and involvement in AWS's "Cautionary Label for Filler Metal" and "Filler Metal" Committees and in NEMA, proposed, drafted, supported, approved, endorsed, ratified and assisted in the development of a vague, confusing, incomplete, and inadequate warning used by the Warning Defendants on their welding consumables that they knew did not sufficiently warn welders or Plaintiff of the adverse health effects associated with exposure to manganese in welding fumes. Defendants were even advised by fellow Defendant Westinghouse that such developed warning was inadequate.

161.    In addition, from 1966 until approximately 1979, Defendants, both individually, collectively, and through their participation and involvement in the AWS Committees and NEMA, also encouraged and mandated Warning Defendants and all other welding consumable manufacturers use, maintain and not deviate from the inadequate warnings developed and approved by Defendants, AWS, and NEMA. Defendants knew that this weak and inadequate warning was placed on the welding consumables that the Plaintiff used from 1966 to 1979. Defendants also incorporated and maintained such inadequate warnings on their own welding consumables from 1966 to 1979. Defendants, through such conduct and actions, substantially assisted and encouraged Warning Defendants to not adequately warn the Plaintiff of the adverse health effects associated with exposure to manganese in welding fumes. Through such conduct, Defendants also acted in concert with Warning Defendants in their common design to fail to warn Plaintiffs and other welders, and further, as joint and concurrent tortfeasors with Warning Defendants in their failure to warn.

162.    Starting with the AWS Special A5 Task Group on Warning Labels "Letter Ballot" in March 1979, Defendants, both individually, collectively, and through their participation and

35

involvement in AWS and NEMA, proposed, drafted, supported, approved, ratified, endorsed, and assisted in the promulgation of an amended vague, confusing, incomplete, weak, and inadequate warning used by Warning Defendants on their welding consumables that they knew did not sufficiently warn welders or Plaintiff of the adverse health effects associated with exposure to manganese in welding fumes. Defendants, both individually, collectively, and through their participation and involvement in AWS and/or NEMA's Labeling and Safety and Health Committees, also encouraged and mandated Warning Defendants and all other welding consumable manufacturers present a "united front" and not deviate from the inadequate warnings developed and approved by Defendants, AWS, and NEMA. Defendants knew that this weak and inadequate warning was placed on the welding consumables that the Plaintiff used. Defendants also incorporated and maintained such inadequate warnings on their own welding consumables. Defendants, through such conduct and actions, substantially assisted and encouraged Warning Defendants not to adequately warn the Plaintiff of the adverse health effects associated with exposure to manganese in welding fumes.  Through such conduct, Defendants also acted in concert with Warning Defendants pursuant to their common design to fail to warn Plaintiff and other welders, and further, as joint and concurrent tortfeasors with Warning Defendants in their failure to warn.

163.    On May 11, 1982, during an AWS "Safety and Health" Executive Committee Meeting, Defendants Lincoln Electric, TDY, Union Carbide, Hobart, and BOC/Airco, despite their knowledge of a welder (Lonnie Wisenhunt) who suffered manganese poisoning from his experience to welding fumes, decided not to warn welders and the Plaintiff about the dangers of manganism in welding fumes. Defendants, through such conduct and actions, substantially assisted and encouraged Warning Defendants not to adequately warn the Plaintiff about the

36

adverse health effects associated with exposure to manganese in welding fumes. Through such conduct, Defendants also acted in concert with Warning Defendants in their common design to fail to warn Plaintiff and other welders, and further, as joint and concurrent tortfeasers with Warning Defendants in their failure to warn.

164.    During a June 5, 1984 AWS "Safety and Health" Executive Committee Meeting, Defendants Lincoln, BOC/Airco, TDY, and Union Carbide, despite their knowledge that "much of the safety and health information published to date never gets to the welder, the individual that most needs it," decided not to take any proactive steps to adequately inform welding about the dangers of exposure to manganese in welding fumes. Defendants, through such conduct and actions, substantially assisted and encouraged Warning Defendants not to adequately warn Plaintiff about the hazards of exposure to Manganese in welding fumes. Through such conduct, Defendants also acted in concert with Warning Defendants in their common design to fail to warn Plaintiff and other welders, and further, as joint and concurrent tortfeasers with Warning Defendants in their failure to warn.

165.    From the mid 1990s up to the present day, Defendants, both individually, collectively, and through their participation and involvement in AWS and NEMA's Labeling and Safety and Health Committees, have continued to support, approve, endorse, ratify, and maintain a warning on Warning Defendants' welding consumables that they know fails to adequately inform Plaintiff and other welders of the hazards of manganese in welding fumes or how to avoid them. Defendants, through such conduct and actions, substantially assisted and encouraged Warning Defendants not to adequately warn the Plaintiff of the adverse health effects associated with exposure to manganese in welding fumes. Through such conduct, Defendants also acted in concert with Warning Defendant in their common design to fail to warn Plaintiff and other

37

welders, and further, as joint and concurrent tortfeasors with Warning Defendants in their failure to warn.

166.    Defendants also substantially assisted, acted in concert pursuant to a common plan, and acted as joint tortfeasors with Warning Defendants' failure to warn Plaintiff about the adverse health effects of exposure to manganese in welding fumes through their manipulation of the medical and scientific literature and their dissemination of false and misleading articles about welding which falsely downplayed and understated the hazards of exposure to manganese in welding fumes.

167.    In January 1938, Defendants ARCOS, Lincoln Electric, TDY, and Westinghouse decided to wrongfully persuade Met Life to alter a publication titled "Health Protection of Welders," because it stated that manganese in welding fumes could cause neurological injury and mentioned the need for respirators by welders. Defendants' attempts were successful, and by the late 1940s, Met Life had removed and conceded any reference to exposure to manganese in welding fumes being dangerous.

168.    In May 1943, Defendant Union Carbide and others caused to be published a false and misleading article in the *Journal of the American Welding Society* that was designed to downplay and understate the hazards of manganism in welding fumes.

180.    On July 11, 1951, Defendant Lincoln Electric caused to be published a false and misleading article stating that manganese in welding fumes had a "clean bill of health." Defendant Lincoln Electric published a similar false and misleading publication in its Handbook of Arc Welding in 1956.

169.    In October 1957, Defendants caused to be published an article in *The Welding Engineer* titled "Welding Hazards: Our Modern Day Mythology", which falsely stated that

38

manganese in welding fumes were not dangerous. Defendants, and in particular Lincoln Electric, disseminated this article to employers and other consumers who questioned the safety of exposure to welding fumes.

170.    In a June 19, 1967 AWS "Cautionary Label for Filler Metal" Committee Meeting, Defendants, and in particular Defendants BOC/Airco, TDY, and ARCOS, and others, in an attempt to deflect attention away from the inadequate warning label Defendants had developed, decided to prepare and disseminate an article to downplay and under emphasize the new warning, an article they described themselves as "slanted," and successfully completed this project in that same year.

171.    In March 1978, Defendant TDY and others attempted to remove advertisements in *The Welding Journal* that promoted welder safety and discussed the health hazards of welding fumes because it hurt their business.

172.    In a September 25, 1978 NEMA "Arc Welding" Section Committee Meeting, Defendants BOC/Airco, Alloy Rods, ARCOS, Hobart, Lincoln Electric, Miller Electric, Stoody, TDY, Union Carbide, and Westinghouse formed a committee called "The Welding Council" to minimize and downplay the health hazards of exposure to welding fumes and persuade OSHA not to further regulate the industry in regards to welding fumes.

173.    Since the 1930's and up to the present day, Defendants have funded and assisted in medical/scientific articles and studies, and in particular articles and studies written or performed by Drs. Warren Olanow, Karl Kiebertz, William Jankovic, Caroline Tanner and Bill Langston, which have misrepresented and falsely downplayed the risk of neurological injury from manganese in welding fumes.

174.    Defendants' conduct and actions in this regard have substantially assisted and

39

encouraged Warning Defendants not to adequately warn Plaintiff about the adverse health effects associated with exposure to manganese in welding fumes. Through such conduct, Defendants acted in concert with Warning Defendants in their common plan not to warn Plaintiffs or other welders, and further, as joint and concurrent tortfeasors in Warning Defendants failure to warn.

175.    Defendants further substantially assisted, acted in concert pursuant to a common plan, and acted as joint and concurrent tortfeasors in Warning Defendants failure to warn by their efforts to oppose the lowering of exposure levels for Manganese, by governmental and quasi-governmental agencies, and in particular, the lowering of OSHA's PEL and ACGIH's TLV for Manganese, to a safe and appropriate level.

176.    In the mid to late 1970's, Defendants attempted to prevent ACGIH from lowering the TLV for Manganese from 5 mg/m3 to 1 mg/ m$^3$.

177.    In the early 1990's, Defendants successfully thwarted OSHA's attempt to lower the PEL for Manganese from 5 mg/ m$^3$ to 1 mg/ m$^3$.

178.    In the mid 1990's, Defendants, and in particular Defendant Lincoln Electric   and through its membership, participation, and funding of AWS, NEMA, and "The Ferroalloys Association," attempted to prevent the ACGIH from lowering the TLV for Manganese from 1 mg/m$^3$ to 0.2 mg/m$^3$ although they knew that exposure at such levels was hazardous.

179.    Defendants, through such conduct and actions, substantially associated and encouraged Warning Defendants not to adequately warn the Plaintiff of the adverse health effects of exposure to Manganese in welding fumes at such levels. Through such conduct, Defendants also acted in concert with Warning Defendants pursuant to their common plan to fail to warn Plaintiff and other welders, and further, as joint and concurrent tortfeasors with Warning Defendants in their failure to warn.

40

## TENTH CLAIM – AIDING AND ABETTING, ACTING ON CONCERT, AND JOINT AND CONCURRENT TORTFEASER IN THE FAILURE TO INVESTIGATE AND TEST THE HEALTH HAZARDS OF EXPOSURE TO MANGANESE IN WELDING FUMES

180.    Plaintiff re-alleges and incorporates the foregoing allegations.

181.    All of these Defendants, both individually and collectively, aided and abetted each other and Warning Defendants' tortuous failure to investigate the welding consumables and machines the Plaintiff used for any adverse health hazards of exposure to manganese in welding fumes, under Restatement (Second ) of torts §876(b) as alleged herein.

¬182.    Moreover, these Defendants also acted in concert with Warning¬Defendants in their tortious failure to investigate or test the welding consumables that the Plaintiff used for any adverse health effects of exposure to manganese in welding fumes pursuant to their common design or plan not to test welding consumables under Restatement (Second) of Torts § 876(a) as alleged herein.

183.    Lastly, Defendants were joint and concurrent tortfeasers with Warning Defendants in their failure to investigate or test its welding consumables for any adverse health effects of exposure to manganese in welding fumes as alleged herein.

184.    Since the 1930's, Defendants individually, collectively, and through their membership and participation in NEMA and AWS, knew of the association between exposure to manganese in welding fumes and neurological injury.

185.    Since the mid 1970's, Defendants individually, collectively, through their membership and participation in AWS's "Safety and Health" Committee and sponsorship of AWS's "Effects of Welding on Health" publication, and through their membership in NEMA, knew that an epidemiological study was necessary to determine the extent and the prevalence of the association between exposure to manganese in welding fumes and neurological injury.

41

186.    Defendants also knew that Warning Defendants had failed to conduct such an epidemiological study or sufficiently test their welding consumables.

187.    Defendants also knew that Warning Defendants and the rest of the welding industry looked to them, AWS Safety and Health Committee, and NEMA for guidance and leadership on whether an epidemiological study of neurological injury and exposure to welding fumes was necessary or warranted.

188.    However, Defendants, individually, collectively, and through their membership and participation in AWS's "Safety and Health" Committee and NEMA, refused to develop, conduct, support, or fund such a necessary epidemiological study or otherwise test their welding consumables.

189.    Defendants' refusal to test their consumables or conduct, support, or fund an epidemiological study of the association between neurological injury and exposure to welding fumes substantially assisted, encouraged and justified Warning Defendants continual failure to investigate or test their products of conduct any epidemiological study. Defendants, through their refusal to conduct an epidemiological study, also acted in concert with the Warning Defendants in their failure to investigate and test, pursuant to their common design not to investigate or test, and further, as joint and concurrent tortfeasors in Warning Defendants failure to investigate or test.

190.    Such conduct and injury proximately caused Plaintiff injury and damage.

## ELEVENTH CLAIM – LOSS OF CONSORTIUM

191.    Plaintiff re-alleges and incorporates the foregoing allegations.

192.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff DONNA TOSCANO, spouse of Plaintiff who was exposed to toxic fumes from welding rods,

42

was and continue to be deprived of the care, consideration, compassion, consortium, and concern of Plaintiff, and have suffered, and will continue to suffer, injuries and damages thereby, entitling Plaintiff DONNA TOSCANO to an award for loss of consortium.

## TWELFTH CLAIM – SEAMAN'S CASE UNDER THE JONES ACT FOR PERSONAL INJURIES

193.    Plaintiff re-alleges and incorporates the foregoing allegations.

194.    Plaintiff brings the captioned action pursuant to the Jones Act, 46 U.S.C. 30104 et seq., previously codified at 46 U.S.C. § 688, and the general maritime law of the United States.

195. At all times and dates hereinafter mentioned, Defendant THE CITY OF NEW YORK owned the vessels Launch #1, #2, #7, #8, #9, #32, #34, and #6.

196. At all times and dates hereinafter mentioned, Defendant THE CITY OF NEW YORK operated the vessels Launch #1, #2, #7, #8, #9, #32, #34, and #6.

197. At all times and dates hereinafter mentioned, Defendant THE CITY OF NEW YORK controlled the vessels Launch #1, #2, #7, #8, #9, #32, #34, and #6.

198. At all times and dates hereinafter mentioned, Plaintiff was a member of the crew of the vessels Launch #1, #2, #7, #8, #9, #32, #34, and #6, and an employee of Defendant THE CITY OF NEW YORK.

199. From May 1989 until January 2004, and prior thereto, Plaintiff was a member of the crew of the vessels Launch #1, #2, #7, #8, #9, #32, #34, and #6.

200. During the period from May 1989 until January 2004, and prior thereto, Plaintiff, without his knowledge, was exposed to manganese, causing severe injury to Plaintiff.

201. Without any fault on the part of Plaintiff, and wholly and solely by reason of the negligence, recklessness and carelessness of Defendant THE CITY OF NEW YORK, its agents,

43

servants and/or employees and by reason of the unseaworthiness of its vessels Launch #1, #2, #7, #8, #9, #32, #34, and #6, Plaintiff was caused to sustain serious personal injury.

202. As a result of the foregoing, Plaintiff sustained damages based on his pain and suffering and such other and further damages as provided by applicable law.

203. By reason of the foregoing, Plaintiff has been damaged in the sum of FIFTY MILLION ($50,000,000.00) DOLLARS.

204. Plaintiff is also entitled to maintenance, cure and medical expenses for the period he was unable to work for defendant THE CITY OF NEW YORK, in the amount of ONE MILLION ($1,000,000.00) DOLLARS.

**THIRTEENTH CLAIM - DAMAGES / PUNITIVE DAMAGES**

205. The Plaintiff re-alleges and incorporates the foregoing allegations.

206. As a direct and proximate cause of Welding Defendants' conduct, Plaintiff suffered the following injuries and damages:

    a.    general and special damages in an amount that will conform to proof at time of trial;

    b.    loss of earnings and impaired earning capacity, according to proof at time of trial;

    c.    medical expenses, past and future, according to proof at time of trial;

    d.    for past and future pain, suffering and disfigurement, according to proof;

    e.    for past and future mental and emotional distress, according to proof;

    f.    for diminution in his quality and enjoyment of life;

    g.    for punitive or exemplary damages, according to proof against Defendants;

    h.    for interest as provided by law; and

    i.    for such other and further relief as the Court may deem just and proper.

44

**WHEREFORE**, Plaintiff demands judgment from Welding Defendants, jointly and severally, for compensatory damages and punitive damages in an amount exceeding the minimal jurisdictional limit of the Court, pre-judgment interest from the date of judicial demand, interest on the judgment at the legal rate until paid, attorney's fees, and costs of court. Plaintiff also demands judgment against Defendant THE CITY OF NEW YORK for the above amounts together with interests and costs.

**JURY DEMAND**

The Plaintiff demands a trial by jury of the maximum number of jurors allowed by law.

Dated: New York, New York
       September 6, 2007

Respectfully submitted,

Andrew V. Buchsbaum (AB-6475)
Email: abuchsbaum@friedmanjames.com
**FRIEDMAN & JAMES LLP**
Attorneys for Plaintiff
132 Nassau Street, Suite 900
New York, NY 10038
212.233.9385
212.619.2340 (fax)

-and-

D. John Neese, Jr.*
Email: jneese@williamsbailey.com
**WILLIAMS KHERKHER LAW FIRM, LLP**
Attorneys for Plaintiff
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5001
713.230.2200
713.643.6226 (fax)

*Application for admission pro hac vice to be filed

45
